IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| James Washington, Jr., | ) | C/A No.: 1:17-3365-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND |
| Andrew M. Saul,[1] | ) | RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Andrew M. Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Saul should be substituted for Carolyn W. Colvin.

I.    Relevant Background

    A.    Procedural History

    Plaintiff initially filed applications for SSI and Disability Insurance

Benefits ("DIB") on August 26, 2009, alleging disability beginning July 16,

2009. Tr. at 81–96. Plaintiff's applications were denied initially, upon

reconsideration, and by an Administrative Law Judge ("ALJ"). *Id.* The

Appeals Council affirmed the ALJ's decision on March 14, 2013, and Plaintiff

declined to appeal. Tr. at 111.

    Plaintiff protectively filed a second application for SSI[2] on March 22,

2013, in which he alleged his disability began July 17, 2009.[3] Tr. at 283–88.

The claim was denied initially and upon reconsideration. Tr. at 149–52, 156–

57. On November 20, 2014, Plaintiff had a video hearing before ALJ Edward

T. Morriss. Tr. at 53–80. The ALJ issued a partially-favorable decision on

February 9, 2015, finding that Plaintiff was disabled as of June 30, 2014. Tr.

at 127–43. On July 19, 2016, the Appeals Council affirmed the ALJ's decision

---

[2] Plaintiff also filed an application for DIB on March 22, 2013, alleging a
disability onset date of January 9, 2012. Tr. at 276. Plaintiff did not meet the
nonmedical requirements for DIB, as his date last insured was September 30,
2010, and the prior ALJ's administratively-final decision was issued on
November 25, 2011. Tr. at 81–96.

[3] The earliest possible established onset date in a claim for SSI benefits is
the application filing date or protective filing date. Program Operations
Manual Systems ("POMS") 25501.370(A)(1). Although Plaintiff alleges an
earlier onset date, the protective filing date of March 22, 2013, is the earliest
possible date to establish onset of disability.

that Plaintiff was disabled as of June 30, 2014, but vacated the decision with respect to the issue of disability prior to June 30, 2014. Tr. at 49–51. The Appeals Council directed the ALJ to offer the claimant an opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision on the issue of disability prior to June 30, 2014. Tr. at 50–51.

On December 12, 2016, Plaintiff had a second video hearing before ALJ Morriss. Tr. at 33–45. The ALJ issued a second partially-favorable decision on May 3, 2017, finding that Plaintiff was not disabled prior to June 30, 2014. Tr. at 12–31. On October 30, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 14, 2017, concerning the period of March 22, 2013, through June 30, 2014. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 51 years old at the time of the most recent hearing. Tr. at 37. He completed high school. *Id.* His past relevant work ("PRW") was as a landscaper and a truck driver. Tr. at 77. He alleges he was unable to work between March 22, 2013, and June 30, 2014. Tr. at 79–80.

2.  Medical History

On July 17, 2009, an electrocardiogram ("ECG") showed Plaintiff to have left ventricular ejection fraction of 20% or less. Tr. at 477–78. Plaintiff subsequently underwent a persantine stress test on July 22, 2009, that reflected left ventricular ejection fraction of 21%. Tr. at 479–80. On February 21, 2011, Plaintiff had another abnormal ECG. Tr. at 535.

On November 15, 2011, Plaintiff presented to Williamsburg Regional Hospital ("WRH") with a three-day history of worsening shortness of breath. Tr. at 656. He admitted to having been noncompliant with his heart and blood pressure medications for several months. *Id.* James J. Thomy, M.D. ("Dr. Thomy"), noted Plaintiff's blood pressure was extremely elevated at 248/144 mm/Hg. *Id.* He admitted Plaintiff for acute pulmonary edema and acute hypertensive emergency. *Id.* Dr. Thomy indicated test results showed "end organ damage to involve the heart, lungs and renal system." *Id.* Plaintiff responded well to intravenous medication. *Id.* By the following morning, Plaintiff "was asymptomatic, alert and oriented." *Id.* An ECG on November 17, 2011, revealed left ventricular ejection fraction of approximately 15%. Tr. at 660. Plaintiff was discharged on November 17, 2011, with diagnoses of acute pulmonary edema, acute hypertensive emergency, acute renal insufficiency, acute hypokalemia (corrected), history of noncompliance, and history of chronic alcohol use. Tr. at 658. Dr. Thomy instructed Plaintiff to

follow a low salt diet and to follow up with Nigel Taylor, M.D. and Advanced Cardiology. *Id.* He prescribed Lasix 40 mg, Potassium Chloride 10 mEq, Enalapril 10 mg, Labetalol 200 mg, and Clonidine 0.1 mg. *Id.*

Plaintiff followed up with internal medicine and cardiovascular disease specialist Ian Smith, M.D. ("Dr. Smith"), prior to discharge. Tr. at 661–62. Dr. Smith indicated he had previously treated Plaintiff. Tr. at 661. He noted Plaintiff was noncompliant with the medical regimen and rarely showed up for office appointments. *Id.* Dr. Smith indicated he believed Plaintiff to be an alcoholic and suggested Plaintiff likely had alcoholic cardiomyopathy. *Id.* He discontinued Labetalol and Lasix and prescribed Torsemide. Tr. at 662.

On January 14, 2013, Plaintiff presented to the emergency room ("ER") at WRH with shortness of breath. Tr. at 433–56, 462–76, 481–94, 500–23. He stated his symptoms had persisted for months and were worse at night. Tr. at 437. The attending nurse observed Plaintiff to demonstrate moderate respiratory distress, with rales, decreased air movement, and pedal edema. Tr at 438. She assessed acute shortness of breath, pulmonary edema or congestive heart failure, and acute on chronic renal failure with hypertensive urgency. *Id.* An ECG was abnormal and showed sinus tachycardia, possible left atrial enlargement, and left ventricular hypertrophy with repolarization abnormality. Tr. at 452. A chest x-ray reflected probable congestive heart failure with more significant infiltration in the right chest than the left. Tr.

at 456. Lab work showed elevated blood urea nitrogen ("BUN")[4] and creatinine levels and low glomerular filtration rate ("GFR"). Tr. at 495. It also showed significantly elevated B-type natriuretic peptide.[5] Tr. at 476. Plaintiff was transferred to Carolinas Hospital System ("CHS") for additional treatment. Tr at 454.

Upon admission to CHS, attending physician Venugopal Govindappa, M.D. ("Dr. Govindappa"), found Plaintiff to be in mild respiratory distress with bilateral crackles and an ejection systolic murmur. Tr. at 460–61. He assessed severe cardiomyopathy, with worsened shortness of breath that was "most likely . . . decompensation of his heart failure," "acute on chronic" renal failure, and complex renal cyst. Tr. at 461.

Plaintiff consulted with internal medicine and cardiovascular disease specialist Thomas L. Stoughton, M.D. ("Dr. Stoughton"), on January 15, 2013. Tr. at 458. Dr. Stoughton noted Plaintiff had "an ejection fraction in the 15% range with chronic class III to IV heart failure symptoms." *Id.* Plaintiff indicated symptoms of heart failure had prevented him from performing daily physical activities. *Id.* Dr. Stoughton observed Plaintiff to be "chronically ill

---

[4] The lab test results reflect Plaintiff's BUN level to be 46, with a normal range being seven to 22 mg/dL. Tr. at 475. Plaintiff's creatinine level was 3.95, with the normal range being 0.3 to 1.1 mg/dL. *Id.* His GFR level was 16.4, with a normal range being 61–5,000 mL/min. *Id.*

[5] The normal range of reference for B-type natriuretic peptide is zero to 100 pg/mL. Tr. at 476. Plaintiff's result was 2260 pg/mL. *Id.*

appearing" and noted few bibasilar rales, 1/6 systolic murmur, and trace lower extremity edema. Tr. at 458. He assessed dilated cardiomyopathy with left ventricular ejection fraction in the 15% range with class III to IV congestive heart failure, hypertension, chronic renal failure, anemia, and complex renal cyst by ultrasonography. Tr. at 459. He stated "[f]rom a cardiovascular standpoint, I believe him to be completely and permanently disabled." *Id.*

Plaintiff consulted with urologist J. Kevin O'Kelly, M.D. ("Dr. O'Kelly"), on January 16, 2013, for a left complex renal cyst. Dr. O'Kelly assessed acute renal failure and left renal complex cyst. Tr. at 457. He recommended additional testing. *Id.*

On January 21, 2013, Plaintiff was examined by cardiovascular disease specialist Prabal Guha, M.D. ("Dr. Guha"). Tr. at 591–93. Plaintiff informed Dr. Guha that "financial reasons" had prevented him from following up with a physician or refilling his heart medications over the prior two-year period. Tr. at 591. Dr. Guha noted Plaintiff's blood pressure to be 161/103 mm/Hg. Tr. at 592. He observed a systolic murmur, but noted no edema. *Id.* Dr. Guha planned to adjust Plaintiff's medications and monitor their effects on his conditions. *Id.* He mentioned potential defibrillator implantation and recommended temporary use of a Life Vest. *Id.* Plaintiff declined the LifeVest "because of financial issues." *Id.*

Plaintiff was discharged from CHS on January 25, 2013, with diagnoses of stage four chronic kidney disease, severe cardiomyopathy, and hypertension. Tr. at 525–34, 536–62, 589–90. At the time of discharge, Plaintiff's blood pressure was 130/78 mm/Hg, his chest was bilaterally clear to auscultation, he had no edema, and he was in fair condition. Tr. at 525. Dr. Govindappa noted the results of the MRI had not been reported, but that Plaintiff may require outpatient follow up with Dr. O'Kelly.[6] *Id.* The abdominal MRI report showed a left renal cyst measuring approximately seven millimeters. Tr. at 576.

On February 22, 2013, Dr. Guha noted Plaintiff had improved with treatment. Tr. at 604. Plaintiff reported fatigue, shortness of breath, near syncope, chest pressure, chest tightness, palpitations, dizziness, and muscle weakness. Tr. at 605. Dr. Guha observed Plaintiff to have "quiet, even and easy respiratory effort" and no edema. Tr. at 605–06. Dr. Guha noted Plaintiff's congestive heart failure was "doing much better" and could be rated as class II or III. Tr. at 606. He observed Plaintiff's blood pressure to be elevated and prescribed Isosorbide Mononitrate ER 60 mg. *Id.*

On April 15, 2013, Plaintiff presented to Dr. Guha for an ECG that showed impaired relaxation pattern of left ventricular diastolic filling, mild-

---

[6] Despite a positive finding on the MRI, the record does not reflect Plaintiff's referral to Dr. O'Kelly for follow up.

to-moderate concentric left ventricular hypertrophy, estimated left ventricular ejection fraction of 50–55%, normal left ventricular size, normal right ventricular ejection fraction, and mild tricuspid regurgitation. Tr. at 574–75, 601–03.

On May 8, 2013, Plaintiff presented to Dr. Guha's office for follow up. Tr. at 598–600. He reported "feeling well" and denied shortness of breath, increased dyspnea, edema, fatigue, or blurred vision. Tr. at 598. Melissa R. Buttles, PA-C ("Ms. Buttles"), found Plaintiff to be alert, cooperative, and in no acute distress. *Id.* She observed normal respiratory effort and no cardiovascular murmurs or lower extremity edema. *Id.* She noted Plaintiff's blood pressure to be elevated at 168/95 mm/Hg. *Id.* Ms. Buttles assessed improved cardiomyopathy, stable congestive heart failure, hypertension, and stable chronic renal insufficiency. Tr. at 599. She continued Plaintiff's medical therapy, prescribed Doxazosin Mesylate for hypertension, and noted his renal insufficiency was managed by another physician.[7] *Id.*

On August 22, 2013, Cleve Hutson, M.D. ("Dr. Hutson"), a state agency physician, reviewed the record and provided a physical residual functional capacity ("RFC") assessment. Tr. at 103–05. Dr. Hutson opined Plaintiff could lift, carry, push, or pull twenty pounds occasionally and ten pounds

---

[7] The record does not support Ms. Buttles's assertion that Plaintiff's renal insufficiency was being managed by another physician.

frequently; stand or walk for two hours and sit for about six hours in an eight-hour workday; occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and hazards due to cardiomyopathy and chronic renal failure. Tr. at 103–05. Dr. Hutson explained, "[Plaintiff] alleges shortness of breath limiting his walking, bending, lifting, kneeling and stair climbing. He can't walk far and it takes 10 minutes to recover. [Plaintiff's] allegations are supported in the longitudinal record with x-rays, exams, function studies and labs." Tr. at 105.

On August 23, 2013, Camilla Tezza, Ph.D. ("Dr. Tezza"), a state agency psychologist, reviewed the record and opined Plaintiff did not have a medically-determinable mental impairment. Tr. at 102.

On November 25, 2013, Kimberly Brown, Ph.D. ("Dr. Brown"), a state agency psychologist, reconsidered the record and opined Plaintiff did not have a medically-determinable mental impairment. Tr. at 117–18.

Also on November 25, 2013, Hugh Wilson, M.D. ("Dr. Wilson"), a state agency physician, reconsidered the record, provided a physical RFC assessment, and affirmed Dr. Hutson's opinion that Plaintiff could lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently, stand or

walk for two hours, and sit for six hours in an eight-hour workday with postural and environmental limitations. Tr. at 119–22.

On June 30, 2014, Plaintiff presented to WRH with shortness of breath, bilateral lower extremity edema, and hypertension. Tr. at 625–54; *see also* Tr. at 625–26, 664–66. His blood pressure was 201/145 mm/Hg. The attending nurse observed Plaintiff to have labored respiratory effort, shallow breathing, ausculated inspiratory rhonchi in all lobes, tachycardia, and +3 edema in his bilateral lower extremities. Tr. at 625–26. Plaintiff was transferred to CHS. Tr. at 638.

Upon transfer to CHS, Dr. Govindappa observed Plaintiff to have mild respiratory distress, ejection systolic murmur, bilateral lower extremity edema, and elevated blood pressure. Tr. at 638. He diagnosed advanced stage five kidney disease with severe cardiomyopathy and worsening shortness of breath. Tr. at 639. He dialyzed Plaintiff emergently to optimize his volume status, discussed peritoneal dialysis, and added a beta-blocker to his regimen. *Id.* An ECG reflected a left ventricular ejection fraction of less than 20%, severely reduced systolic function, severe global hypokinesis, and borderline right ventricular enlargement. Tr. at 645–46. On July 7, 2014, Mark S. Pack, M.D. ("Dr. Pack"), laparoscopically placed a peritoneal dialysis catheter. Tr. at 641–43. Plaintiff was discharged on July 11, 2014, with instruction for outpatient dialysis. Tr. at 640–41.

On or about July 14, 2014, Plaintiff was approved for Medicare because of end-stage renal disease. Tr. at 654–55.

Plaintiff followed up with Dr. Guha on October 23, 2014. Tr. at 670–72. He reported "doing well" and denied chest pain, shortness of breath, palpitations, or significant leg swelling. Tr. at 670. Dr. Guha noted Plaintiff had not returned since April 2013 and was on peritoneal dialysis. *Id.* Dr. Guha found Plaintiff to be alert and to have normal respiratory effort with no murmurs or edema. *Id.* Dr. Guha assessed cardiomyopathy and congestive heart failure, ordered an ECG for further evaluation, and scheduled an appointment for blood pressure recheck. Tr. at 671.

On November 11, 2014, Plaintiff followed up with Ms. Buttles. Tr. at 667–69. Ms. Buttles noted that the October 2014 ECG showed Plaintiff to have left ventricular ejection fraction of 55–60%. Tr. at 667. She found no murmurs or edema and normal respiratory effort. Tr. at 667–68. She assessed stable benign essential hypertension, improved cardiomyopathy, and renal failure and noted Plaintiff's blood pressure appeared well controlled, his ejection fraction had improved to a normal range, and his medical therapy and dialysis would continue. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     November 20, 2014 Hearing

Plaintiff testified that he stopped working because of congestive heart failure in 2009. Tr. at 57–58. He indicated he lived alone and prepared his own meals. Tr. at 66–67. He stated he had recently been approved for Medicaid, but had previously had no health insurance or medical assistance. Tr at 58. He indicated his cardiologist required an office visit to refill his medications and he could not afford to pay for the visit. Tr. at 58–59. He testified that he had repeatedly been denied Medicaid benefits and was unable to afford to follow up for medical treatment. Tr at 60.

Plaintiff stated he had experienced extreme fatigue since 2009. Tr. at 60–61. He testified that following his January 2013 hospitalization, he felt severe shortness of breath upon walking short distances and performing household chores. Tr. at 59, 65. He indicated he had swelling in his stomach and bilateral legs. *Id.* He stated he typically elevated his feet while sitting to reduce swelling. Tr. at 64. He endorsed shortness of breath if he lifted any item heavier than a gallon of milk. Tr. at 64. He stated he had visual problems that prevented him from reading fine print. Tr. at 61. He indicated his fatigue would have prevented him from performing a sedentary job in 2013. Tr. at 66.

Plaintiff testified that he was undergoing daily dialysis at the time of the hearing. Tr. at 62. He indicated he continued to experience fatigue and shortness of breath if he attempted any activity requiring physical exertion. *Id.*

b.      December 12, 2016 Hearing

Plaintiff testified he last worked in July 2009. Tr. at 37. He stated he had several hospitalizations stemming from blood pressure problems because he was unable to take his medications as prescribed. Tr. at 37–38. He indicated his cardiologist had declined to examine him because he could not afford to pay for treatment. Tr. at 38. He stated he did not have the money to fill prescriptions or to visit a physician on a regular basis after he stopped working. Tr. at 38, 42.

Plaintiff testified he presented to the ER in January 2013 for shortness of breath and swelling in his legs and was transported to another hospital for treatment. Tr. at 39. He stated he was diagnosed with heart failure, kidney failure, and vision problems. Tr. at 39–40. He indicated the doctors encouraged him to "take it easy" with respect to work. Tr. at 40. He endorsed swelling, shortness of breath, and an inability to walk any significant distance following the January 2013 hospitalization. *Id.* He stated he could not afford to follow up for medical treatment or to fill prescriptions for diuretics. Tr. at 41, 43.

After his January 2013 hospitalization, Plaintiff indicated he reapplied for disability. *Id.* He stated he started dialysis in June 2014 and continued to receive it daily. Tr. at 40. Plaintiff testified that he was able to obtain his medications and better control his blood pressure after being approved for Medicaid. *Id.* He indicated his medical condition had remained unchanged since June 2014. *Id.*

2.    The ALJ's Findings

In his decision dated May 3, 2017, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since the protective filing date (20 CFR 416.971 *et seq.*).

2.    Since the protective filing date, the claimant has had the following severe impairments: chronic heart failure; chronic kidney disease; and hypertension (20 CFR 416.920(c)).

3.    Prior to June 30, 2014. The date the claimant became disabled, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that prior to June 30, 2014, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he needed a sit/stand option and would need to change positions but not more frequently than every 30 minutes. Additionally, he could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl. The claimant was unable to climb ladders and needed to avoid concentrated exposure to extreme cold and concentrated exposure to fumes and other respiratory irritants.

5.    Since March 22, 2013, the claimant has been unable to perform any past relevant work (20 CFR 416.965).

6.  Prior to the established disability onset date, the claimant was a younger individual age 18–49 (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Prior to June 30, 2014, transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Prior to June 30, 2014, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 416.969 and 416.969(a)).

Tr. at 18–23.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ improperly inferred Plaintiff's disability onset date without having consulted a medical advisor;

2)  the ALJ failed to perform a specific function-by-function analysis to support the assessed RFC; and

3)  the ALJ did not cite substantial evidence to support his conclusion that Plaintiff's testimony was not fully credible.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[8] (4)

---

[8] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404,

whether such impairment prevents claimant from performing PRW;[9] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[9] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Disability Onset Date

Plaintiff alleges the ALJ erred in inferring his disability onset date without having consulted a medical advisor. [ECF No. 10 at 7]. He maintains the ALJ erred in failing to find that he became disabled on March 22, 2013.

*Id.* at 2. He contends that he was unable to engage in a full range of sedentary work as of that date. *Id.* at 2.

The Commissioner argues the ALJ was not required to consult a medical advisor to determine whether Plaintiff was disabled prior to June 30, 2014. [ECF No. 11 at 6]. He maintains substantial evidence supports the disability onset date of June 30, 2014, because Plaintiff first met the requirements of Listing 6.03 on that date. *Id.* He contends the records prior to June 30, 2014, show that Plaintiff recovered without the need for dialysis. *Id.* at 7.

"It is easy to assign a date of onset to disability caused by a congenital defect or traumatic injury, but chronic, progressive diseases require a great deal more inquiry." *Gray v. Apfel*, 191 F.3d 447 (Table), 1999 WL 710362 at *1 (4th Cir. 1999). If a claimant alleges a disabling condition of non-traumatic origin, the ALJ must consider the claimant's statements as to when the disability began, the day the impairment caused him to stop work, and medical reports containing descriptions of his examinations or treatment in determining the onset date of disability. Social Security Ruling ("SSR") 83-20, 1983 WL 31249 (Jan. 1, 1983).[10]

---

[10] SSR 83-20 was rescinded and replaced by SSRs 18-1p and 18-2p on October 2, 2018. SSRs 18-1p and 18-2 state "[w]e expect that Federal courts will review our final decisions using the rules that were in effect at the time we

A claimant's alleged onset date should be used if it is consistent with all the available evidence. *Id.* However, additional evidence may be needed to reconcile discrepancies when the medical or work evidence is inconsistent with the onset date alleged by the claimant. *Id.*

It may be necessary for an ALJ to call on the services of a medical advisor when an informed judgment of the facts is necessary to determine when the claimant's impairment or combination of impairments reached a disabling level of severity. *Bird v. Commissioner*, 699 F.3d 337, 341 (4th Cir. 2012). In *Bailey v. Chater*, 68 F.3d 75, 80 (4th Cir. 1995), the court stated "[t]he requirement that, in all but the most plain cases, a medical advisor be consulted prior to inferring an onset date is merely a variation on the most pervasive theme in administrative law—that substantial evidence support an agency's decision."

In the instant case, the ALJ was not required to consult a medical advisor to determine whether Plaintiff met Listings 4.02, 6.03, 6.04, and 6.05 prior to June 30, 2014, because the evidence required no "informed judgment of the facts" beyond that which the ALJ could easily assess. *See Bird*, 699 F.3d at 341; *Bailey*, 68 F.3d at 80. Listing 4.02 requires chronic heart failure while on a prescribed regimen of treatment in addition to other factors. 20

_____

issued the decisions." As the ALJ's decision in the instant case was issued on May 3, 2017, the undersigned has considered the case using SSR 83-20.

C.F.R. Pt. 404, Subpt. P, App'x 1 § 4.02. The ALJ explained that Plaintiff was not following a prescribed treatment regimen when he experienced symptoms of heart failure in January 2013 and that Plaintiff no longer experienced systolic failure after his medication routine was stabilized. Tr. at 19. Listing 6.03 requires chronic kidney disease with chronic hemodialysis or peritoneal dialysis and Listing 6.04 requires chronic kidney disease with kidney transplant. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 §§ 6.03, 6.04. The record supports the ALJ's statement that "[p]rior to June 30, 2014, the claimant did not require dialysis or kidney transplant." Tr. at 20. In addition to other factors, Listing 6.05 requires reduced GFR evidenced by laboratory findings on at least two occasions at least 90 days apart during a consecutive 12-month period. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 6.05. The ALJ addressed the other factors in noting that "prior to June 30, 2014, there was no evidence of renal osteodystrophy, peripheral neuropathy, or fluid overload syndrome." Tr. at 20. Furthermore, as the record contains only lab test results documenting Plaintiff's GFR during his January 2013 hospitalization, it is devoid of the necessary records to prove disability under Listing 6.05. In light of the foregoing, the ALJ relied on sufficient evidence and was not required to consult a medical advisor to find that Plaintiff's impairments did not meet or equal a listing prior to June 30, 2014.

The ALJ found Plaintiff to be disabled on June 30, 2014, because he met the requirements of Listing 6.03 as of that date. Tr. at 138. However, the undersigned notes that "[p]articularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reaching listing severity (i.e., be decided on medical grounds alone) before onset can be established." SSR 83-20.

To support his conclusion that Plaintiff was not disabled prior to June 30, 2014, the ALJ noted that Plaintiff's symptoms and ejection fraction had improved following his January 2013 hospitalization. Tr. at 21–22. He stated the following:

> The record contains no evidence of treatment from May 2013 until June 2014, when [Plaintiff] was hospitalized again. The claimant testified that he was having kidney trouble during this interval but there are no records to support this allegation, and this is inconsistent with the claimant's statements in follow up treatment notes from February 2013 and May 2013. The claimant did not go to an emergency room for a kidney problem until June 30, 2014, the time of the established onset date. Overall, the evidence prior to June 30, 2014, documents only improvement after his hospitalization in January 2013 with no further treatment for a kidney problem.

Tr. at 22.

Plaintiff has chronic, progressive diseases, and the ALJ's establishment of disability onset date should have been met with "a great deal more inquiry." *See Gray*, 1999 WL 710362, at *1. Although the ALJ correctly notes that the record reflects Plaintiff's improvement between February and May

2013 and contains no evidence of treatment between May 2013 and June 2014, the ALJ neglected nonmedical evidence regarding Plaintiff's reported symptoms and functional abilities over the period. On May 29, 2013, Plaintiff indicated in a function report that his ability to work was limited by congestive heart failure, shortness of breath, and high blood pressure. Tr. at 357. He indicated he had difficulty sleeping because of shortness of breath. Tr. at 358. He noted he had difficulty lifting, bending, kneeling, walking, and remembering. Tr. at 362. On September 24, 2013, Plaintiff reported the following: "Everything I do makes me very fatigued, and sometimes I am tired without doing anything. I have a lot of shortness of breath when I exert myself. I have to take my time getting dressed." Tr. at 370. He further indicated he was "unable to do any activities without a lot of fatigue and shortness of breath." *Id.* He stated he felt chest pain and "rest[ed] a lot." *Id.* Plaintiff reported that he was unable to afford to follow up with his doctors. Tr. at 371.

The ALJ determined Plaintiff's disability onset date based on the absence of medical records between May 2013 and June 2014 and evidence showing Plaintiff's impairment met Listing 6.03 on June 30, 2014. However, disability onset may be established prior to the date on which a claimant meets a listing, SSR 83-20, and the Fourth Circuit has warned that "[i]n the absence of clear evidence documenting the progression of [the claimant's]

condition, the ALJ [does] not have the discretion to forgo consultation with a medical advisor." *Bailey*, 68 F.3d at 80. Therefore, it is necessary that the ALJ consult with a medical advisor who may review the evidence in its entirety and provide an educated opinion as to Plaintiff's disability onset date.[11] In light of the foregoing, the undersigned recommends the court find that substantial evidence does not support the ALJ's finding that Plaintiff was not disabled prior to June 30, 2014.

2.     Additional Allegations of Error

Because the undersigned finds the ALJ's failure to consult a medical advisor in establishing Plaintiff's disability onset date to be a sufficient basis for remand, the undersigned declines to address Plaintiff's additional allegations of error.

III.   Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the

---

[11] The undersigned has considered the SSA's statement that it will apply SSR 18-1p "[i]f a court reverses our final decision and remands a case for further administrative proceedings after the applicable date of this SSR." Although SSR 18-1p provides that "the decision to call on the services of an ME is always at the ALJ's discretion," the undersigned reminds SSA that the ALJ's determination of onset date must be supported by substantial evidence.

undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

July 10, 2019
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).